2024-50149, United States of America v. State of Texas et al., and Los Americas Immigrant Thank you. May it please the Court, the most straightforward argument to resolve this deal is standing. The theory pressed by Los Americas that it intends to divert resources to counteract government action, that it views as inconsistent with societal goals, is the theory of standing pressed by the Alliance for Applied Medicine and rejected by the Supreme Court. Like Los Americas, the Alliance argued the challenge of governmental action impaired its ability to provide services and achieve its organizational mission. The Supreme Court held that argument does not work to demonstrate standing. In Hayden's real view, the defendant gave the plaintiff's employee false information about apartment availability, which interfered with the organization's home, referring low-income home seekers to available apartments and violated statutory right to truthful information about housing availability. The case does not hold that organizations have standing to challenge any practices directed at third parties that interfere with their mission or societal goals. If this Court reaches the preemption inquiry, the Court should be guided by three background facts. First, this is a pre-enforcement challenge, and as the Supreme Court noted in Arizona, in this posture there is a basic uncertainty about what the law means and how it will be enforced. Second, this is a facial challenge, and that's a challenge that comes at a cost, requiring the plaintiff to show that there is no set of circumstances in which the law can be enforced. And third, SB 4 contains a remarkably robust severability provision, allowing severance of every application, every phrase, every word of the statute. All of this means that any preemption inquiry would need to be very granular, provision by provision, and require the plaintiffs to show, bearing their burden, to demonstrate no set of circumstances in which application is possible. As the United States held the explanation at the Geneva speech, preemption would be based on the text and structure of two federal statutes that issue, in particular, 8 U.S.C., Section 13.5A, and Section 13.6. These are straightforward criminal statutes, not intended to occupy the entire field, and not statutes that create a conflict with the state law at issue. But as I said, I urge the Court to resolve the case on standing grounds and believe that the briefing merits of preemption or the other arguments in our brief is unnecessary. My plan is to begin by discussing the facts of the agency, which I think is a key point of this brief. With that introduction, is it fair to say that Texas is not urging an invasion argument? And if you are, how does that – would it have to come secondary to us saying no preemption? So, Judge Higgins, I am certainly not urging abandoning the invasion argument or not abandoning any of the arguments. Okay. If you aren't abandoning it, would you agree that we would first have to find no preemption? In other words, if Texas is using its constitutional wartime powers through its judges, judicial orders, Texas court orders, can't themselves violate federal law? Your Honor, I think we may see the hierarchy slightly different. Where the Constitution gives a right to Texas, in this case the state self-defense clause, that right to the state created by the federal Constitution, couldn't be infringed by federal statutes. Now, to the extent you're asking about the order of operations in the reversal of temporary injunction, I actually think that's a fairly difficult question. I will say that the state's position is that Judge Oldham's concurrence is correct, and that there probably is no strict order of operations when the state is being – when the court is being asked to reverse the issuance of a temporary injunction because they're saying that the issue is not the exercise of judicial power. And so our sense is this court could say the district court should not have exercised the judicial power in issuing a temporary injunction, either because the district court lacked jurisdiction, or because there's an unjusticiable political question, or because there's no likelihood of success. All of those result in the same outcome. There shouldn't be an exercise of the judicial power. I recognize that's somewhat an unsettled category. We do think it follows the first principle, so to be clear, that's different from a take-nothing judgment, which is an issue – which is an exercise of judicial power in a resolution of the case. So your point is the court can pick and choose whether to do it based on standing, GI, or a political question. These are options. We're not required to do one or the other. Yes, Your Honor. That's actually the position. Now, certainly, in order to reform the issuance of the temporary injunction – Right, right, right. I'm saying for you to prevail, it's a choice for us. There's no order of operations, and I agree with that. We can do the PI merits, we can do standing, we can do political question. But it sounds like you're in no way rebelling against a political question win. You're just saying that, in your judgment, standing is just an easier way for the court to put together a majority. Yes, Your Honor. You're not – whether it's U.S. v. Abbott or this case, a political question win is a win. Judge Howe, my hope is that this Court is going to issue a decision reversing the grant of the temporary injunction. You want to win, exactly. Yes, Your Honor. You'll take any theory that gets you the win. I think that's correct. I'd suggest that, for this Court's jurisprudence, it would be helpful to have a majority opinion from the Ombuds Court. Anything standing is probably the easiest analysis because we have the decision of the Supreme Court in FDA v. Alliance for Democratic Matters. My friend's primary standing argument rests on Haven's realty. Now, as the Supreme Court's usual case, the Court has been careful not to extend the holding beyond that. So let's start with the context, which is Haven's pursuit between two private parties. You had a private plaintiff and a private defendant. So we're already stepping a little bit beyond the context of Haven's itself when you're trying to use Haven's to reach standing prudence about challenges to government regulations. But when we look at Haven's, we see Home, the organization in that case, had standing because the defendant gave false information to its employer. That violated a statutory right under the Fair Housing Act. The claim asserted by Home was under Section 804B of the Fair Housing Act. That conferred the right to any person to truthful information about housing feasibility. Home's argument is fairly simple. Home, this organization, is any person. You said standing is the easiest, but it's also jurisdictional. So we have to decide that before we would get to any merits issue. If we concluded that there was standing, we would get to the merits. But if we concluded there wasn't, we would have to be done, right? I'm not entirely certain that would cause those issues. And that's because the holding that a temporary injunction should not have issued, as we see it, is simply a holding that the district court should not have exercised the judicial power in this manner. Now, this court obviously has to show itself in its own jurisdiction. There's no question of that. This court's jurisdiction has not been challenged. So this court has jurisdiction to review the district court. But if this court were to hold the district court should not have exercised the judicial power in granting a preliminary injunction, we don't think the court needs to start and first say, we need to ask whether the district court had jurisdiction in their temporary injunction. But if the people down below don't have standing, that ends it. That's certainly true. Okay. That's the point that I'm making. But I think what's being appealed to this court in order to grant a temporary injunction and the question is, does this court necessarily have to rule on the district court's jurisdiction in holding that a temporary injunction should not have issued? I recognize that it's somewhat uncertain testimony and I make the argument in the first principles about what it means to exercise judicial power and why this court needs to review that. Well, it might be helpful to talk about standing, but wouldn't it also for the court to issue an opinion if it were so inclined on standing? It would also perhaps be important for the court to issue an opinion on temporary injunctions, perhaps, given that that's a topic of some  Chief Judge, I apologize. Which aspect of temporary injunctions? Whether this was a proper use of the power of the district court to grant an injunction of this sort. I think so. But, Chief Judge, that holding would probably primarily focus on the likelihood of success. And I do think that's an area in which we're holding by the on-law court. It would not matter as much in this context? It may not have the same broader importance. To be fair, it's very important to the State in this case. This is an exceptionally important statute for the State, and that's for very important reasons. It is important to have a granted inquiry, right? I'm not in any way suggesting that we do not want a decision on temporary injunctions in this court on the likelihood of success analysis. If there was no standing, why wouldn't that be advisable? Because the court's holding would be that the district court should not have issued a temporary injunction. The district court shouldn't have exercised its judicial power in that manner. They both lead you to the same place. You go to the conclusion that the district court should not have granted a temporary injunction and that the issue of the temporary injunction should be reversed. Well, that's what we did in Abbott, right? In Abbott, we specifically dealt with the merits and avoided the jurisdictional political question issue. Rightly or wrongly, that's what we did. So it's already our court's practice. I believe that's the case. So Chief Judge Albright, I do think a grant inquiry would be important. It could provide very helpful guidance. We're not trying to steer away from that. But we also frankly just think that the standing is the easiest issue because we have FBA versus linesman practice. Let me refer to Havens just quickly, because I do think it's important that the Supreme Court and Alliance pointed out that Havens really involved Havens providing Holmes black employees false information about apartment availability. That's when Havens inherited Holmes' ability to provide housing. But in that example, Holmes was a third party. They did not give false information to the employee as an employee of Holmes. The employee was acting as I'm in the open market for housing and in Havens' realty made a misrepresentation. So it was not because there was no connection from that between the representation and the status of the employee as vis-à-vis Holmes. To clarify, this actually came up in oral argument in Havens' realty in the Supreme Court. And I think the evidence is there was no evidence that the defendant knew that the employee was connected to Holmes. But there's also no dispute that the employee was acting in the course and scope of her appointment for Holmes when she was given false information. Holmes' theory was it's right under 804E. Well, the discussion in the case did not go off on employee status. There was a big discussion in the case about whether a person who is not involved directly can be, you know, whether they have a cause of action under the statute. The Supreme Court said yes. Even if they're not directly injured by the violation, the statute says any person, and so they gave them the right to sue, not because it was made to their employee. I think we may read it differently. I encourage you to take a look at what Alliance said. I'm looking at what Holmes said. Well, I suggest you have a fairly short analysis of the organizational standing in Holmes. Because the organizational standing was so straightforward, Holmes said it was any person when false information was given to its employee. Holmes described it as truthful, right information. And then you would conduct essentially what is a transunion inquiry. Is that statutory right connected to an actual injury? Holmes had an interest in that information. It didn't have some academic interest. It needed to use that information in order to refer low-income people to housing. But not to prefer its employees. That was the whole point. The employee was taking a standing in as a client, essentially, of home. Because home didn't care. Its employee wasn't looking for home. And they weren't worried about their employees getting houses. They were worried about their clients getting houses. Right. And in order to do that, and this is how the Supreme Court explained it in Alliance, in order to do that, Holmes needed truthful information about housing availability. If Holmes' employees were being lied to, it couldn't actually happen. So you think if the employee had not been employed by home, the case would have come out differently. Is that your position? Absolutely, Your Honor. According to Alliance, they said Hayden's Realty was like a retailer suing a manufacturer for being sold defective goods. So by that analogy, you can think of home as being a retailer of truthful information about housing availability. That's what it's And how is it being sold defective goods? Well, it's being sold defective goods when Hayden's, when the owners of apartments are lying to home and its employees about housing availability. So it's being deprived of this truthful, right information that it needs. And if these owners of apartments, the homeowners, are lying to home, then the home cannot have truthful information about housing availability to refer low-income home seekers. Mr. Peterson, I have a question about the majority opinion in this case. I'm looking at page 650, and the panel majority says Speak up, please. The panel majority says on page 650 that this is just like Hayden's because the director of the Department of Public Safety lied to the public when he said that he would enforce the law because the law was preempted, and he obviously couldn't enforce the preempted law. So this is no different from the injury in the present case because when Texas enacted the laws, I'm reading from page 650, the director of public safety said to the public that it has lawful authority to enact it. So how is that lie different than the lie in Hayden's? Well, first of all, we would suggest it's not a lie at all. That's our presentation about the truthful authority to enact the law. It's pretty much a generalized sort of statement about the law. It's not information that anyone needs to conduct their business at home. And Hayden's really very much involved in something approaching a traditional court, a misrepresentation made directly by a defendant to a plaintiff. And some of this court's cases have read Hayden's case, and probably Alliance for the Practice of Medicine makes clear that organizations, regardless of their roles, don't have the authority to spend their way in standing by opposing policies that they disagree with. We want a concrete interest. And Chief Justice O'Rourke, you asked about a ruling on the merits versus a ruling on standing. One of the things that the Supreme Court pointed out in Alliance for the Practice of Medicine is that standing up serves to protect the autonomy of those who are most directly affected by state laws. One of the goals here is making sure that people who are actually regulated by the state law at issue are the ones whose voices are being heard who are challenged in this. This is not a case where the plaintiffs are directly subject to the state law at issue. They're not directly subject to the federal law at issue. They may casually disagree with them. They may want to spend money on services opposing what they see as the outcome of those laws. Well, HOME was not directly regulated at? It wasn't, but I think the Supreme Court's retail and manufacturing analogy in – well, actually, so two points are on that. First one is that HOME is serving a statutory right under federal law. HOME's theory was 804D, I am in person, and you have the property of my right to truthful information. And it essentially understood that they had done so. There's an amicus brief filed by the United States in Hayden's Realty, which I do think has a helpful discussion of the standing analogy there. And so essentially this is very straightforward. The organization's person who committed a deprivation of the employee of their statutory right to truthful information, if that employee has standing to sue under the Fair Housing Act because that employee has been deprived of their right, then the employer surely does as well. Well, why wouldn't we just on the – I have a few merits questions because it seems to me – but I will say why I think we do get to the merits. The district court made very explicit jurisdictional fact-finding determinations. Seems to me far more than a perceptive impairment, the district court said Las Americas, quote, SB 4 will completely change the manner in which plaintiffs must reach counsel and represent noncitizens as they navigate the federal immigration process while in state prison. That is a jurisdictional fact-finding that has nothing to do with manufactured or self-inflicted injury. That is far more than a perceptible impairment. It will completely change the nature of their preexisting services. So respectfully, Your Honor, I disagree. Yeah. And I think a lot of work in that sense is being done by the word must. And that's the problem there. It's the district court's findings about the must are premised on to the extent that Las Americas would like to continue achieving its societal goals with the same level, with the same degree, with the same results. It must, in response to state law, modify that in order to – modify its practices in order to continue ensuring that individuals… So if Harris County enacts a restriction on gun rights, are you saying gun advocacy and litigation organizations can't stay? We're not going to reset anything electronically at this moment in the courtroom, given our precarious state. But I believe Judge Higginson was asking you a question. And if we could just start there. And we do apologize again to all the participants and to you especially,  Certainly. Thank you, Your Honor. Judge Higginson, what is the Eighth Circuit's decision in Iowa versus… Converter. Yes. You asked about field preemption. Field preemption, would we conflict with Byrd? And then I'm not going to do a four-part, just two-part question. Factually on conflict preemption, reading the injunction hearing below, Texas took the position to avoid conflicts with Mexico, that if Mexico would not accept back a returned person, that Texas would then drop the SB4 prosecution. Is that still the position of Texas? Let me answer those one more time. Yes. So field preemption with Byrd, no. Byrd is a conflict preemption case, not a field preemption case. Would there be a split with respect to conflict preemption in part? The Iowa statute had the illegal reentry provisions equivalent to Texas 51.03. It didn't discuss an equivalent to Texas 51.02, the illegal entry provision of our law. And I'll note that there is a drop in the SB4 prosecution. My understanding is that I don't need to be in existence for what you said previous. Our interpretation of 51.04 is that it requires a refusal to comply with a return order. And if a person cannot return to Mexico, if Mexico would not accept them, then they have not refused to comply. So it assumes that it is possible for a person to comply with a return order. But if they cannot comply with that, they have not violated the return order. Thank you. I'd like to answer your earlier question as well with respect to standing. So I think that was an excellent one. It's very easy to set up hypothetical involving a gun rights organization. Very close to the circumstance here. You might have a gun advocacy organization that provides services in the form of individual training and education about firearms laws. It's going to provide services to members of the public talking about gun laws. It might continuously oppose new gun regulations. The fact that it simply chooses to tell people about the laws, and when there's a new gun regulation, it's not going to tell people about additional laws and develop new educational materials, we would say that does not give rise to standing under a line of sort of private medicine. That's simply an organization voluntarily spending its weight into standing. And keep in mind, if that were correct, it would truly open the floodgates for standing. That creates the possibility of just forming an organization that says our mission is education about criminal law. And suddenly that organization has standing to challenge any new criminal law anywhere in the country, because that organization is going to be spending additional money in the form of services to educate people about the new criminal law after it comes out. And I think the organization can make the same sort of determined mission arguments as well. Say my mission, my goal for society is to educate the American public fully educated about criminal laws. The imposition of new criminal law, so that they will be fully educated or be less fully educated about every criminal law other than this one. And that's just the sort of floodgates for standing that the Supreme Court was trying to close in a line of sort of private medicine to say, well we truly want to be able to support individuals with a concrete interest. We haven't talked much about the merits of the sanction analysis. I really wouldn't suggest you the uniqueness brief of the United States, because I think it does an excellent job of focusing very granularly on federal statutes in question. In particular, if you look at 8 U.S.C. section 1325A, it states, any alien subject to law who enters or attempts to enter the United States at any time or place other than as designated by the immigration officers shall be fined. That's it. There are not federal defenses to that crime. There are not a suggestion in statute passed by Congress that any change in an alien's status is an affirmative defense to that crime. There is nothing in statute passed by Congress that says if you are subsequently granted asylum or applied for asylum, you are not guilty of a violation of 8 U.S.C. section 1325A. It's simply a crime, plain and simple. And it may well be that a particular executive administration may choose to enforce that by Congress, even in a way that is affected by determinations on the civil side of the immigration laws. But nothing in the statute passed by Congress directs the executive to do that. Nothing in the statute passed by Congress suggests that Congress admitted anything other than what it said, which is entering the United States at a time or place other than designated by immigration officers is a crime, full stop. So we see this as essentially the heartland of Gantz v. Garcia, where you have two different sovereigns criminalizing the same conduct, and the possibility that the federal government may exercise prosecutorial discretion is simply inherent in the fact that it's possible for the state and federal government to make the same conduct. That's it. I do think the easiest way of resolving this would be on standing grounds. We urge this Court to apply a line of therapeutic medicine and reverse the granting of temporary exemption on that basis. Thank you. We have your argument, and we've saved time for rebuttal. I want to hear from Mr. Watsy. Is it Watsy? Watsy, yes. Thank you, Your Honor. Is that loud enough? That's good. Okay. Thank you, Your Honor. That is the Court. Watsy, ACLU. Every court will address laws like this before, and indeed, every judge outside of this circuit is eager to be likely preempted by federal law. And when the Supreme Court turned away Florida's state application, there were no noted dissents. That makes sense. The argument testifies to making flying the case of a 150-year-old drumbeat of Supreme Court precedent, making clear that entry and removal are exclusively federal business. Most of the discussion today is focused on standing, so I'd like to start there. And in particular, I want to start with what I see as kind of the key error in the state's presentation on Havens Realty. What the state is saying is that Havens reduces to a particular fact, namely that it's a lie to an employee of the organization. That makes no sense within the context of Havens Realty. In Havens, the defendant was lying to home seekers, and the organization home was not involved in those conversations, as Dr. O'Connor was pointing out. That was directly between the defendant and the home seekers, and the organization wasn't kind of conduit for information, like a real estate agency or something like that. Instead, the only reason that the organization lied to its employees is because it sent in a tester who's posing as a home seeker. But that was to prove the racial smearing. It was not the essence of the injury itself. And that could not be clearer from the Supreme Court's decision, which I think shows that the test starting is demonstrably incorrect. Later in the opinion, in addressing the statute of limitations, the court distinguishes between the statute of limitations, and this is at page 381 of the opinion, the court distinguishes between the statute of limitations as to the tester themselves and the statute of limitations for the organization. The tester was outside of the statute of limitations because the false information given to the tester was beyond that limitations period. The organization's claim was within the statute of limitations because it was the full pattern of racial smearing extending to the latest incident of racial smearing, which was a lie told to somebody who was not an employee of the organization. If Texas' theory of what Hayden says was right, then it would have come out the other way on statute of limitations, and it did not. Beyond that, I think Texas wants the court to understand an alliance to essentially limit Hayden's, to his facts. We've heard a couple of different facts that it wants to highlight. Maybe that it was private versus public. Maybe that, you know, sort of question of whether it was actually regulated, but that's not what alliance said. Alliance reaffirmed Hayden's and distinguished it. In alliance, the theory was that an organization that was a pure issue advocacy organization could spend $1 opposing a policy and then have a stand. But alliance said that's different from an organization that provides direct services. It would make no sense for the Supreme Court to single out that distinction as critical if what it really meant to say is either you can ignore what Hayden's willing to call together or some other distinction that is being drawn today is what's actually the critical one. So I think that Texas starts grasping to try and find more in the alliance opinion that is there and ultimately have to run for source, which is what did Hayden's realty actually say? We're not asking for some standing exceptionalism rule like what the court just approved in Moss for candidates. We're asking for the regular rules in our country's standing to apply to less Americans. Under those regular rules, organizations that are not directly regulated routinely have standing to assert all kinds of injuries of economic and non-economic organizations that are impaired by voting changes that build up for farmers, that are impaired by regulations on other farming entities, like in Monsanto, and individuals whose recreational or aesthetic interests are harmed by environmental regulations on others. Of course, it cannot be generalized. There's nothing generalized here. Los Americas is impaired by S.B. Gore in a way that few anybody else can show. So Mr. Wolfsey, you say that the state is grasping in its interpretation, but this court in a panel opinion issue, as you know, before the panel opinion, in this case, said that the Supreme Court has limited Hayden to its facts. And that panel of this court also said, the alliance court clarified that Hayden's does not support standing where an organization diverts its resources in response to a defendant's actions. Rather, those actions directly affected and interfered with its core business activity. So I suppose you would say that the Deep South panel, again, which under our rule of orderliness was the first opinion here, is also grasping? Your Honor, I'd like to sort of have three responses on that. So the first is that I think Deep South addressed a situation exactly like Alliance itself, that is, an organization that was pure issue advocacy and saying, I want to spend money in my issue advocacy. And so I think it was controlled by the facts of Alliance. And so that really would have been picked up. Number two, we do think that that is incorrect and irreconcilable, really, with what the Supreme Court did in Alliance itself. Number three, as to Your Honor's question about the rule of orderliness, you know, I think, obviously, we're here now at the on-law court, and so I'm happy to answer questions about that if the Court has them. But I think the question is really at this point for the Court to resolve what Alliance and Havens mean together. Well, how is it grasping to read what the Supreme Court said in Alliance? Havens was an unusual case, and this Court, the Supreme Court, has been careful not to extend the Havens holding beyond its context. It's hardly grasping to say that they limited Havens. The other thing is, is they gave this analogy of a retailer purchasing defective goods from a manufacturer. Well, in Havens, effectively, Holmes used a secret shopper. That doesn't mean Holmes couldn't have sued the person that provided the defective goods, the untruthful information. There's no secret shopper here, though. So, Your Honor, in terms of it being an unusual case, I think that that has to be understood. No, limited to its context. Yes, Your Honor, and limited to its context. I think that that has to be understood in what the Court said was the, quote, critical context. The critical context was that it wasn't a curiosity or advocacy organization. It was, in fact, a direct services organization. I also think that Alliance, more generally, is a reminder that you do have to go through the steps that are in the Article III analysis. You need to make sure that you're showing causation, redressability, that this isn't generalized grievance, and so on and so forth. And so, it may be that what the Court thought is that in many cases that Havens maybe was applied either, you know, maybe not by this Court, as this Court has limited it in various ways to, you know, abide by those rules, but maybe by other courts, it felt that it was being applied to loosely, and so courts need to make sure they're checking those Article III boxes. But I don't think that it's a reason to say that what Alliance is saying is Havens can be ignored. Havens should only apply, for example, to this particular kind of claim under this particular statute, where there's, as Your Honor says, a secret chopper. I don't think that anything in the opinion supports that, and the Court certainly knows how to say that about one of its prior opinions if it didn't do so, and I personally don't think it's for this Court to say so now. Now, as for the secret chopper... Mr. Wofsy, I mean, that's, I think if you've answered his question, what services do your plaintiffs provide? Yes, thank you for the question, Your Honor. Yeah, I think that's pretty critical. I agree, Your Honor, and I would like to respond to something the State said about that. So yes, information and counseling, also direct representation in, for example, peer interviews and so on and so forth. How does that differ from what the ACLU does? I'm sorry, Your Honor? How does it differ from, for example, my job? Yes. Yes, Your Honor, we have very few cases, and they're typically in the appellate posture. I would say Los Americas... All right, how about the Southern Poverty Law Conference? How does that differ from them? Yes, Your Honor, I think that there's a lot of organizations that do legal work. I think that if I understand the off-shoulder question, the reason this is not generalized is because we've shown in a factual way the fact that this new law layers an entire new state system on top of it. Well, Baker & Botts represents clients who are involved in municipal bonds, and many big law firms do, and it is not unusual for a state or city to change the rules applicable to bonding. And when they do, Baker & Botts has to redeploy its resources to represent its clients effectively, so then how does it differ from Los Americas, whatever they are? Right. So, Your Honor, I think this goes to something that the state suggested, which is, well, if all you're doing is just, you know, giving an update about a change, then on our theory of understanding, I don't think that's right. The Higgins test has to perceptively compare your way of providing... What's the difference? Is it the amount of money? What is it? How would you write an update to distinguish your client from a big law firm advising about a seminal change in law? Absolutely, Your Honor. So what I would say is, for example, Los Americas doesn't point us in every time before immigration appeals issues a new immigration law, even though they might intend to make a change in some of their documents, whatever. That is sort of baked into the way that they do business. That is not a perceptible impairment. That's a quick edit. That's sort of part of... Of course, the law is always changing, so it's part of the job of a lawyer to deal with the law changing. The difference here is that this is an entirely new system that's overlaid on top of the one that already exists. And so, very concretely, it's not that Los Americas needs to get... Well, let's take a law firm that's represented people before administrative agencies for decades, and suddenly the jarczy decision is decided. And suddenly they can't go before ALJs anymore, people with whom they have a history, experience, possibly personal interaction, and so on. And now they're dealing with, God forbid, a federal court, which is very unpredictable. They have to redeploy their resources, too, in a very major way. Do they not? Your Honor, I think that there might be a case for standing under those circumstances. I'm also not familiar with the particular kind of way that those places operate. But I do think that that is a very big difference from sort of an everyday change in updating your legal materials. And I think that for Los Americas here, the concrete way to think about it is, before SB 4, there are clients who are undocumented people who are seeking asylum, so forth, who are out in the community, able to come into Los Americas' offices and get advice and counseling and representation. Or they're in federal detention where Los Americas already has systems, already has the relationships and access. Afterwards, they're going to be in state jails and state prisons. That's going to, by itself, make it more complicated and expensive for Los Americas. But isn't this just diversion of resources? And again, Alliance for Hippocratic Medicine said that's not enough. Your Honor, I think what Alliance says, and I think particularly in light of BOST, what Alliance says is you can't spend money if you don't have that initial harm. And we agree with that. But BOST makes clear, spending money, spending resources reasonably, you can call that diversion of resources, spending money reasonably in response to a cognizable harm is an entirely acceptable and cognizable form of Article III injury. And so I don't think that reading those two cases together, you can come away with, for example, the idea that the diversion of resources in Los Santos is not a proper injury. In fact, it is. And so that's the bottom line about Alliance, that in Alliance, in the opinion, before it's clear, the organization wasn't harmed in its preexisting activities by policy. What it was saying is we oppose this policy, and we spent money opposing the policy. That is a generalized rule. That's an indication to just have anyone have standing for anything. Counsel, if I could shift gears for a second. I realize we've been talking about standing, but on the issue of preemption, how does the severability clause in SB 4 impact your argument, if at all? Yes, thank you, Your Honor. So I don't think the severability clause comes into play, because as the panel said, every instance and all the provisions of SB 4 are preempted. I'm happy to talk about why that would be. I think the most straightforward reason is that they are field preempted. But likewise, they're not preempted in every application and every provision. And that's exactly what the Eighth Circuit concluded unanimously in the Iowa case. Obviously, if the Court were to disagree with that in some way, I'm happy to answer specific questions about severability. But I don't think any of those provisions can be applied constitutionally in any way. And so it's not really to sever. There's a few other provisions of SB 4 besides the three sort of primary entry, reentry, and removal provisions. But those are all kind of just have no effect on those three final provisions. Mr. Wobsky, I'd like to take you back to standing for just a moment. You mentioned earlier that your client provides a range of services. But the services that you've described sound to be primarily legal. What is the range of services that your client provides? Yes, Your Honor. I think it's all sort of under the umbrella of legal services. But it's legal information, advice, counseling about options, and then representation in particular proceedings, as well as referral to other legal services. For example, for people who are moving out of state, of course under SB 4, they'll be in state jail. So they won't be transferred out of state. Counsel, remind me, how many aliens did Los Americas directly represent in the last year for which we have data? Yes, Your Honor. I believe that the record says that they, I apologize for the number off the top of my head, I believe it's somewhere between 2,000 and 4,000 that they assisted in some way. There was a variety of different forms of assistance. Exactly, Your Honor, which isn't responsive to my question. So obviously providing a referral, providing a pamphlet, different than direct representation. So if the question, this goes back to something that Judge Jones asked you, which is if the thing that is differentiating Los Americas from the Alliance for Hippocratic Medicine is the direct representation, how many did Los Americas directly represent? They appeared in front of an immigration judge. They noticed an appeal to the BIA. Heaven forbid they ended up in federal court. How many was that for the last year for which data is available? I apologize, Your Honor, I don't remember the number. I don't see anything in record. I'm not faulting you. I've tried. Obviously, I've been involved in this case for some time. And I can't find the number. Yes, Your Honor. And I guess our point would be that actually doesn't matter. In the same way that in Haven's Realty, the question wasn't, okay, well, exactly how many home seekers were going to be directed away from this. Haven's Realty, remember, was only about one apartment complex that people were being racially seared away from. That's not the question. If you look at Haven's Realty, what it says is that it's inherent to the organizational efforts to try and have equity in housing. And so likewise here, I think the record is clear that Los Americas for a long time has essentially been in triage mode. That is, they go to where people are in the most risk of being removed from the country without any access to asylum. That's exactly what they did when the Title 42 process was initiated by the federal government. And it's what they're dealing with, what they will be now in response to SB-4. I think that's entirely consistent with their mission and their past work. And it is a demonstration of the inherent, I think, you know, to the question about alliance and how it relates to BOS. You know, I think of the sort of diversion of resources or spending resources as kind of a way of measuring the initial harm. That if you're reasonably spending those resources, say, in Monsanto to pay for testing to ensure that crops aren't contaminated by genetically modified organisms, that's a way of kind of making the harm, the initial harm, which is that risk of contamination, a little easier to get your hands around. So I think here, Los Americas is very reasonably taking these steps to address this brand-new system that we've overlaid on top of the federal system at the standing stage. But on your theory, it wouldn't matter if it was one pamphlet and one client or 2,000 square feet, one apartment, right? So it shouldn't really matter, right, on your theory? I think that's right, Your Honor. I think the caveat, I think, you know, so obviously the standing rule is, you know, there's no sort of quantitative measure of standing. But the rules that are coming out of Hayden's is perceptible impairment. So I think if you're talking about one client, I think the Court could reasonably ask the question, maybe it's factual question in that case. Does the fact that it's perceptible impair the operations of this organization? I think that's why it matters here, that this is such a large system and it's such a new approach to immigration, the state's seven minutes on immigration. Yeah, you've mentioned the newness a couple of times, updating materials and totally changing. I'm curious, what provision of Texas law are you going to have to use to be like, actually now there's this brand-new legal requirement that you didn't have before when you go to update your pamphlets or whatever, or you go to meet somebody in a state facility. What is the new requirement that did not exist prior to SB 4 that you're going to have to say, hey, listen, here's the alien registration requirement, here's the entry requirement, the reentry requirement, the removal requirement. What is the thing that you're going to have to tell them about? So I think that there's two aspects that are new. And it's not necessarily about what we're telling the clients. It's more about how we're providing the services that you're all getting. So one of the things I've already mentioned is the location and access to clients, that is state jails versus, you know, so obviously that's, you know, I think that's clear from the statute itself. The other piece of it is the removal provision, which I know we can talk about what exactly that means, but I don't think that there's any dispute in the 6th Act or the Eighth Circuit, but in the case of the provision itself, it says if you don't leave, you get 20 years in prison. And so what that means, particularly in the way SB 4 is set up, where it is by design encouraging people to take that, you know, quote unquote voluntary removal order as early as possible and be out of the country under threat of 20 years in prison, I think that what that means is that people are in grave risk of being removed without any access to asylum. And so that's going to change if your organization is trying to make sure people have access to the protections that are available under federal law. Where's the constitutional right to file an asylum application? I mean, access to asylum is sort of, all that means is you want your clients to have something pending for 10 years, right? Your Honor, the constitutional issue here is a supremacy clause issue. 8 U.S.C. 1158 specifically says that this exact population, those who enter without inspection, must be afforded the opportunity to apply for asylum. And our point is that Texas is stepping in and saying, actually, we disagree. People should be expelled from the country with no opportunity to apply for asylum. That could not be a more straightforward supremacy clause. Certainly that could be litigated easily enough if anybody, if the law ever goes into effect and one person comes to power of it, right? I think the same thing could have been said in Arizona, which, of course, is a pre-enforcement preemption challenge that's struck down. Well, but part of that law was not conflict preempted, correct? That's right, Your Honor. Section 2B was not conflict preempted because the court read it to only require exchange of information which is specifically provided for in federal law. But the court said that that provision would have been preempted if it had allowed for the kind of unilateral immigration enforcement that was struck down in Section 6, that this court rejected in Palmer's Branch, and that's exactly what Texas is doing. Before your time elapses, I just want to make sure as a placemark question, are you still asserting a separate theory of standing under Ex parte Young? If so, what do you understand in Texas's response to be? On preemption, I just want you to have opportunity to respond, since it's a question of whether this is an exclusively federal field, respond to the federal government's brief here, the amicus brief. Are they asserting at all that they have discretion over Texas criminal proceedings? Are they asserting any Article IV duty that they have stepped in to assist a state that's being invaded? And I guess, has the government, the federal government at all said that it has abandoned the field of removing foreign nationals? Thank you, Your Honor. So on Ex parte Young, I don't think it's a separate standing theory. It's, you know, the state has raised defense that we don't have a cause of action, but my point is, this is an absolutely traditional Ex parte Young claim. Now, you know, I can talk about the details of that, but I think that this Court's recent on-law decision in Green Valley, which is essentially unanimous, I think is basically dispositive. Ex parte Young is a simple, straightforward inquiry. It's the same inquiry for both the Eleventh Amendment and for availability of equity. That's the law of the circuit. That's also kind of consistent with how the Supreme Court has handled the equity question. I think, Judge Jacobson, it's your question about whether the United States is in the history. I appreciate you bringing it up. I don't understand the United States to have said any of those things, and in particular, you know, the United States doesn't seem to be defending the expulsion provision of that state law, and it is not defending the idea that there, you know, an invasion here would allow the state to overcome federal supremacy. I think, also, I would just refer the Court to the Iowa decision on the United States' history. Obviously, preemption is a question of congressional event, and so the particular argument of the White House needed to decide what federal laws mean, and that's exactly what the Eighth Circuit said. Would you please address the argument that was made about 8 U.S.C. 1325? Is that the right side? Yes, Your Honor. The preemption argument about that, yes. So I think that it points out a really fundamental misunderstanding of the statutory structure here. So I think both the United States and Texas today are focusing exclusively on this one provision or two provisions, 1325 in Texas, that is, the criminal provisions. But as the panel explained, there are numerous provisions of federal law addressing both the entry into the United States and the expulsion from the United States, and what they do, taken as a whole, is they give the federal government a wide range of tools to address the conceivably complicated questions that come up when you're talking about people who enter without inspection, with policy interests pointing in different directions. And the Congress, as the Supreme Court has said over and over, has squared that circle in this context by vesting the federal executive with broad discretion to decide how to handle individual cases. That is not discretion for the state of Texas. Actually, that's exactly what the Iowa court said. But I think it's useful to take a step back and look at the field preemption question, because if that goes to field preemption, it really only goes to one of the two problems of field preemption, that is, whether there's a comprehensive scheme. But of course, we know that the test for field preemption in the Supreme Court is in the discovery of its either dominant interest or a comprehensive scheme. And I've heard no argument in the state of Texas to suggest that the federal government's interest in entry and removal is anything but dominant. How could they say that, given 150 years of the Supreme Court saying it's not just dominant? But what about, I mean, our line of case law involving mirroring laws, where states are trying to help the government? So would it be possible for states along the northern border to decide to help the government and enact automatic asylum application processes? So the flip of this, states elsewhere deciding they want to help the government with its asylum process, so here's availability for an automatic asylum through state laws. What would your position be, equally, that that would be conflicting with federal exclusive powers? Thank you, Your Honor. I'm trying to think through the hypothetical, because I do think it raises some different kinds of questions. Obviously, there are some things states can do, and so I'll give you a couple of examples, but I want to come back to the asylum question before. So certainly, states can do things that constitute cooperation under the narrow provisions that Arizona's state federal law allows states to have a role. That's like the Supreme Court's decision announcing MISO, for example. States also, of course, have anti-commandeering rights in terms of not using their own resources for this and that. I think that, Chief, Your Honor's question, I think that's my question of how that works, because if what's happening is they're, for example, assisting, providing financial or practical assistance to non-citizens, I don't think that would concern Jonathan, because that's sort of just like locality paying for a lawyer for somebody. I can't see how that Here, we actually have a regulation about who may or may not enter, what the penalties are going to be, and who's going to remain or has to be expelled. So I think it's much more of that sort of confrontation. I also think, for example, that we're not saying that asylum is a preemptive field, necessarily. I think that would be an entirely different question. What we're saying is entry and removal are the preemptive field, and those are things that, going back over a hundred years, the Supreme Court has said are absolutely essential to the sovereignty of the United States as a nation. And so I think that you have to understand that as the context for this whole case. Texas suggests it has those same sovereign powers, but with respect, that's not what the Supreme Court has said. He incurred his right in full last year, and immigration cases all the way from China up through Arizona. Turning back to the standing argument, it seems that your standing argument relies a bunch that this is novel, that this is new or innovative or something that, you know, the industry is changing. But couldn't the same thing have been said about the abortion pills case, that the changes in the regulation opened up a whole new way of abortion being taking place across state lines, with no medical supervision. And so these abortion doctors, doctors who have performed abortions against their viewpoints to do so, religious views to do so in the emergency room, that they are having a flood of new, not just new business, but fundamental business because they're not tied to the traditional providers because there's no provider anymore. Why isn't that a fundamental change? And that was obviously, as our Court well knows, that was not good enough for standing. But it seems that that was fundamentally changing a situation via regulation. So why would that not be comparable and why does this work in this context and not in that context? Thank you, Your Honor. I see my time has started. Let me respond. So I think it's important to understand a couple of things about all of this. First, there's really two standing theories that the Court addressed, and I want to make sure we keep that set up. So I think Your Honor is talking about the standing theory as to doctors. And, you know, I don't think that the Court disputed the idea that this was new. What they disputed was, is that that chain of causation was too intangible. That is, there were too many sort of if, if, ifs in getting from a doctor getting an abortion pill, doctors not before the Court, patients not before the Court, to a doctor in an emergency room somewhere else. They said, we just don't think that chain of causation is close enough. There's nothing like that here. Obviously, the SB4 is operating directly on the consumers of Los Angeles' operation headquartering, the market that we are acting in. In terms of... But they were the consumers of the emergency doctors' operations. Your Honor, with respect, I understand the Court's use that that is just too many inferences away in the last week. It's a different issue and it's not a part of what the understanding of taxes is making. So you don't see any differences, any comparisons with the large industry, the changes in the law or the industry? I think that the reason that the agreement on the change matters is because the test on the case was real. The end of the SB4's longstanding precedent is perceptible in the way it's always done. So in some ways, yes, the newness matters because that's the way you show this action is causing perceptible compared to the way you were doing business. Thank you. Thank you, Your Honor. You may have the floor. Thank you. A few points. Mr. Peterson, the plaintiffs rely on somewhat embossed. I don't blame them. If I were they in the Supreme Court eight days ago, issued an opinion that found standing, I think I'd find a way to use it too. The question is whether they're grasping and trying to do that. And let me just read to you a paragraph that you gave us in your 28J letter on Boston and ask you to elaborate on that. It's just only two sentences. You said, Boss reiterates that plaintiffs cannot manufacture standing by voluntarily incurring costs. It does not support plaintiff's contention that this rule is limited to lobbying costs and does not apply to costs to provide services. Yes, Your Honor. As I read my friend's brief, I understood the argument to be that Alliance for Democratic Medicine prohibited organizations from acquiring standing by advocating or lobbying against policy positions that they oppose. And that where an organization is promoting a policy by providing individual services, they can still expend resources and divert resources to acquire standing that way. That's not how we read Alliance for Democratic Medicine. We don't think the Supreme Court's recent decision changes that analysis either. We read that decision as simply looking at the close link between a candidate's interest in the election and the election rules governing that election. And when it comes to the argument about what was happening in Alliance, keep in mind that Alliance did make the argument we are providing individual services, and our current provision of individual services is being disrupted by the change in the law. They said we are currently providing services and educating our members about the dangers of surgical abortion. The FDA has changed what it is doing, and now to achieve that same result, we have to not just do that, we have to provide individual services and educate our members about the dangers of chemical abortion. And my friend mentioned the attenuation portion. We did raise this in our work. We cited that portion of the discussion in Alliance, but I do think it has some applicability. And I think the argument in the court is between two points, injury being speculative with injury being attenuated. It sounds like it's speculative. It is attenuated because it's speculative, because we can't prove it because the inference is not at all. That's not from the Supreme Court in Alliance. It looked at speculative and attenuation separately. And it said, causation requirement rules out attenuated links where it's so far removed from dissonance that it cannot get predictable. Ripple effects, the plaintiffs can't establish out of a free standing. And we think the standing theories are definitely for the doctors that are relevant here as well. Even if you can predictably say, I as a doctor, I'm going to incur some injury from treating emergency room patients, the court just said, that's going to open the floodgates of standing. It's just too attenuated from the person who's actually being affected by the governmental action of that issue. And that links, we talked about Kowalski versus Tesmer in our briefing, the concept of third party standing. All of this does kind of wrap together to limit standing where you have governmental action operating on third party. There's a question about ex parte none. Our position there, to be clear, is that you can't over-bring ex parte. Ex parte none, there are essentially two hurdles we need to go through. Ex parte none talks about sovereign immunity. But we don't bring ex parte none itself as providing for lack of a better word, a cause of action. It's simply recognizing that traditional equitable principles also allow plaintiffs, or often allow plaintiffs to get into court. But we continue to satisfy those two separately. So in addition to getting through the ex parte none hurdle, you also need to be able to look to the lack of a better word, common law powers of the federal courts and say, those freestanding equitable powers allow us to get into court and seek equitable relief in the absence of statutory cause of action. Yes, there's certainly right there that's been recognized. The question is what limits, if any, are there on that right? I think my current position is it just goes to the full scope of Article III, full stop. But I don't think there's any reasonable explanation for why that would be the case. We cited a thing with Nelson's article suggesting that it should be much more focused on the rights at issue. Are you serving your own rights or someone else's? Some essentially in third party standing principles. There was a question about separability. I think separability truly underscores the facial challenge at the bottom here, which is that if the intent of the Texas legislature, even if there could be adequate challenges to some portion of this statute or even some category of this statute, the Texas legislature wanted to enforce this statute to the greatest extent possible. So truly it is a no set of circumstances. For these reasons, we would urge the Court to reverse our induction. Thank you. We appreciate all the arguments in this case and your patience with the Court today. Before we stand for recess, we have 10 minutes before we pick up the next case.